Owens *v.* Whitaker.

---

BRACKETT OWENS and JOEL JACKSON *v.* AQUILLA WHITAKER and DANIEL SULLIVAN.

*In Chancery.*

This suit was brought in the supreme court for the district of Kentucky, and removed for trial, on the erection of the district into the state of Kentucky, to the court of appeals.   The case, as stated by the complainants in their bill, was as follows, to-wit:

That they, together with a certain Jonathan Smith, on the 21st day of April, in the year 1780, entered with the surveyor of Kentucky county 1,334 acres of land, on a military warrant, in the following words, to-wit:

"Jonathan Smith, Brackett Owens and Joel Jackson, assignee of Jonathan Smith, enter 1,334 acres of land in Kentucky, by virtue of a warrant for military service performed by the said Jonathan in the last war, on Brashear's creek, beginning at Margaret Pendergrass' corner on the creek, at a walnut, sugar tree and hoop-wood; then on Holeman's line to his lower corner; thence on the said Holeman's line east to his corner, a beech and sugar tree; thence south on a marked line to a corner, a poplar and beech; thence on said line west to said creek; thence north to the said Pendergrass' south-west corner; thence to the beginning."

And that, on the 22d day of April, in the said year 1780, the defendant Aquilla obtained a certificate from the court of commissioners for a right of pre-emption of 1,000 acres on the west side of Brashear's creek, in the following words, to-wit:

"Aquilla Whitaker this day claimed a pre-emption of 1,000 acres of land at the state price, in the district of Kentucky, on account of marking and improving the same in the year 1776, lying on a branch of Brashear's creek, on the west side thereof, below and adjoining the land of Pendergrass, to include his improvement. Satisfactory proof being made to the court, they are of opinion that the said Whitaker is entitled to the pre-emption of 1,000 acres of land, to include the above location, and that a certificate issue accordingly."

And that, on the 30th day of October, in the same year, he entered the same with the county surveyor, in the following words, to-wit:

"Aquilla Whitaker enters 1,000 acres on a pre-emption warrant, on Brashear's creek, adjoining Margaret Pendergrass on the lower side, and to adjoin a line to be run south from her lower corner, and to lie west of said line."

That at the time the said entries were made, the complainants fully expected that the lines and corners of Pendergrass' and Holeman's land were fully fixed and established, as the said claims had been surveyed and run out by a certain Nicholas Merewether, which surveys were afterward approved by the claimants, at whose request they had been made.

That some time after the making of the entry of the complainants, George Wilson, who had intermarried with Margaret Pendergrass, resurveyed the settlement and pre-emption granted to the said Margaret, and run the lines differently from those run by the said Merewether, and agreeably to which the complainants had entered, and extended the same much further down the creek, so as to include a part of their land.

That at the time the said Wilson made the said resurvey he was employed by the complainant, Brackett Owens, to survey the entry of the complainants, but that after he had made the alteration aforesaid in the lines of Pendergrass's claim, and thereby included a part of their entry, he refused so to do, and referred the complainant Brackett to the defendant, Daniel Sullivan, a deputy surveyor, who was at that time attorney in fact for the other defendant.

That the said Daniel Sullivan undertook to survey the claim of the complainants, and after some private conversation with the said Wilson, set out to make it in company with the complainant, Brackett Owens. That the complainant Owens being unacquainted with the said entry and adjoining claims, and being unable even to read the location, gave the said Sullivan no further direction relative to running out the land than frequently to charge him to survey the same strictly agreeably to entry.

That the said Sullivan, when he had surveyed the said land, informed the complainant Owens that it was done agreeably to entry, and that the complainants were not otherwise informed until after the plat and certificate of the said survey had been returned to the register's office, and a patent had issued thereon, when they discovered that the said Sullivan had not begun their survey at the lower corner of the said Pendergrass, on the creek, as made by the said Merewether, and as called for in their entry, but had begun the same at the lower corner of the survey thereof as resurveyed and removed by the said Wilson, and had extended it much further down the creek than their entry and the prior and better claims of others would admit, and had thereby left out of the said survey a large part of the land included within the entry.

That he had surveyed on the land included within the said entry the pre-emption of the defendant Whitaker, who has obtained a patent thereon. That their entry was specially made, and prior to the obtaining the defendant Whitaker's certificate or the making his entry with the surveyor, which was entered and surveyed as

upon vacant land, and includes no improvement made by or for the said Whitaker previous to his obtaining said certificate.

That the said Sullivan, after he had surveyed their entry as aforesaid, frequently boasted that he had deceived and greatly cheated the complainant Owens in making the said survey, and that he had fixed him properly. And they prayed that the defendant Whitaker might be compelled to convey as much of his pre-emption as lay within the bounds of their entry.

The defendant Whitaker admitted that he obtained such certificate, made such entry and caused such survey to be executed, as is stated by the complainants, which survey, he alleged, was made not only agreeably to the location with the commissioners, but in strict conformity to an agreement entered into between Nicholas Merewether, who made the complainant's entry, and himself, which agreement he thought himself bound to observe.

That when he obtained his certificate from the commissioners, Nicholas Merewether was present, who immediately informed him of the location made by him on a military warrant, for the complainants, which, he said, would interfere with his claim, and proposed to him to settle the boundaries of their claims in such a manner as to prevent future disputes, and that each might obtain his full quantity of land. That he agreed, in order to avoid litigation, to fix the boundaries, and proposed to the said Merewether that the creek by its meanders should be the dividing line between his claim and that of the complainants.

That the said Merewether objected to this proposal, and made himself the following : That a line run south from Pendergrass' lower corner, so far that each would be enabled to get his quantity, should be a dividing line between the said claims.

That he closed with this proposal, and the said Merewether, on the part of the complainants and himself, entered into a bond in the penal sum of twenty thousand pounds, to stand to and abide by the said agreement, which bond was lodged in the hands of a certain Meredith Price, who was a witness thereto, to be kept by him until the agreement was performed.

That in October, in the year 1783, the complainant Owens told him he had seen the bond, and that he liked it very well, for that he understood their claims interfered, and was glad to have the matter settled amicably; that he was adverse to going to law, and was obliged to Merewether for having settled the matter.

That they then appointed a time to survey their lands, and he

gave Owens a token to Price to get the bond, that they might run the lines agreeably to it, and when done that it might be canceled.

That being himself obliged to leave this district, he appointed the defendant Sullivan his attorney in fact, to act for him in this business, without further or other directions than that he should act for him as he would do for himself, and at the same time informed him of this bond, and that Owens would give it up when the survey was made agreeably to it. That when he returned, the said Sullivan informed him the surveys had been made, not strictly agreeably to the agreement, but in a manner more favorable to the complainants, and that he surveyed as he did in order to enable the complainant Owens to get his quantity, which he could not have done if he had been confined to the south line mentioned in the condition of the bond, and that after the surveys were made Owens had delivered him the bond, which he had canceled.

That when he returned to Kentucky, which was about the month of January, 1784, the complainant Owens had left the district, but that he came in the winter 1784-5 to settle on the land, and applied to him, who was living on it, and supposed to be well acquainted with the boundaries, to show them to him, as the said Owens had been some time absent, and might have forgot their particular situation, and to show the dividing line between them, which he did; and that this being the first time he had seen the said Owens since the making of the survey, he asked him how he liked it and the division of the land, to both of which questions the said Owens answered he liked them exceedingly well, and was happy the dispute had been so settled.

That in a further conversation with the said Owens on the subject of the land, the said Owens told him he had had a long dispute with Wilson about the removing the private surveys made by Merewether before he could get the matter settled to his mind; that Porter having moved down the creek on Pendergrass' claim, Wilson wanted to move Pendergrass down upon him, but that he would not consent to it unless Wilson would agree to make the same kind of trees corner to the new survey as were cornered for the old, that the location might stand good, to which Wilson agreed, and did it, he said, to his entire satisfaction.

That the said Owens, in the year 1785, at which time, and long before it, he was as well acquainted with the manner in which the land had been surveyed and its situation, as he is now, proposed

to exchange a piece of land with him, part of the land surveyed for him, and which is now claimed by the said Owens, which he states as a further proof of the satisfaction of the said Owens with the manner in which the surveys had been made.

That although the entry of the complainants was made before his certificate was granted, his claim being founded on and granted for an improvement which he has included, must take date from the making that improvement. He denied that he had been guilty of any fraud on the complainants, or any other person, or that Sullivan had ever informed him that he had cheated, deceived or defrauded, or in any manner injured the complainants.

Daniel Sullivan, the other defendant, stated that the complainant Owens, some time in the fall of the year 1783, applied to him as a deputy surveyor to survey the land of the complainants; that in consequence of this application he met him on the land, and the said Owens, piloted by Squire Boone, went to the lower corner of Pendergrass' survey, as made by Merewether (who was not a sworn surveyor), in order to begin the survey for the complainants

That when there he told the said Owens that if the survey was begun there it would run into other claims and produce dispute, but that he was ready to make the survey in any manner the said Owens would direct him.

That Owens asked him how he knew the survey would run into other claims if begun there, to which he answered he knew it by the entry, and produced the entry to the said Owens, who said he could not read it; that he read it to him, and handed it to Boone, who also read it to the said Owens; that the said Owens appeared to be satisfied to suspend executing the survey, proposing to meet again, and in the mean time to give Wilson notice to attend, that the boundaries of Pendergrass' land might be fixed, the corner established, and the whole business finally settled.

That another day was appointed, and Wilson had notice and attended, but that something prevented him from attending on that day, and he did not arrive until a day or two after the time agreed on; and that in the mean time Wilson, by his permission before given, between the day appointed and the time of his arrival, had surveyed Pendergrass' land, and marked the corner as now established, the said Owens attending and assisting to make the survey, as he was informed.

That the day after his arrival Owens went with him (Wilson not being present) to the lower corner of Pendergrass' survey, as

made by Wilson, as Owens himself informed him, and told him it was the lower corner of Pendergrass', and his beginning corner, and directed him to begin the survey at that corner, which he did, and by the said Owens' direction run therefrom south with Holeman's line to his south-east corner; thence south to a corner made by the said Owens; thence west parallel with Holeman's and Pendergrass' southern boundary, the whole length thereof, to another corner made by the said Owens; thence north to Pendergrass' south-west corner; thence east to the beginning, to include the land of the complainants, and the defendant Whitaker, intending afterward to divide the same agreeably to the agreement contained in the bond entered into between the said Merewether, as agent for the said Owens, and the defendant Whitaker, which was to be done by extending a line from Pendergrass' lower corner south until it should intersect the southern boundary, which is a west line of both the tracts.

That after the survey had been made as aforesaid, by the express direction and in the presence of the said Owens, he having full power to act for the said defendant Whitaker in his absence, he gave the said Owens his choice to take the eastern or western part of the tract, or rather of the two tracts, included by his direction, as aforesaid, in one survey.

That the said Owens, after taking a day to examine the situation and quality of the land, determined to take the east end of the tract, surveyed as aforesaid.

That the day after Owens had made his choice they proceeded to a division of the land, which was intended to have been made agreeably to the bond aforesaid, to the terms of which the said Owens had fully and freely acceded; but finding that if the said Owens was to be confined, as he might have been, to a south line from Pendergrass' corner, as the dividing line between him and the defendant Whitaker, that he would not get his quantity, he agreed that the dividing line might be run forty poles west of the south line as aforesaid, which being done accordingly, the said Owens expressed his entire satisfaction at it, and thanked him for giving up the difference.

That the business being thus fixed and settled to the satisfaction of the said Owens, he gave up the bond to him as attorney for Whitaker, and acknowledged himself perfectly satisfied, and confessed that the dividing line was run very much in his favor.

That he never did consult with Wilson how to cheat Owens,

nor did he ever boast that he had done so; and that he made the whole of the survey (except the dividing line), which was made as aforesaid, strictly agreeably to the directions of the said Owens, without regarding the interest of Whitaker, Pendergrass, or any other person.

That he was acting as a sworn surveyor, and in the district allotted to him as such, when he was making the survey, and that he was not in any degree interested, and, therefore, had no temptation to act unfaithfully or dishonestly.

The connected plat in this cause was the same as in the cause of *Jackson and Owens* v. *Wilson and wife.* See the plat and explantion, No. 27, p. 159.

A jury was impaneled to find facts, who found the following:

*First.* That Margaret Pendergrass, now Margaret Wilson, having obtained a certificate from the commissioners for a settlement and pre-emption on Brashear's creek, did prior to the twenty-fifth day of April, 1780, employ a certain Nicholas Merewether, to lay off and mark out the bounds of her settlement and pre-emption, who prior to the said day surveyed and marked the same as described in the connected plat by the lines and figures 1 8 14 13. That the said Margaret after the said survey was made, and prior to the said twenty-first day of April, did approve of the said survey as made by Merewether as aforesaid,

*Second.* That the said Nicholas Merewether after the making of the said survey, and after Margaret Pendergrass had approved thereof, made the entry for the complainants as stated in the said bill.

*Third.* That the figure 8[1] in the connected plat represents the walnut, sugar tree, and hoop-wood, called for in the complainants' entry as their beginning.

*Fourth.* That the lines and figures 8 2 3 5 6 7 represent the lines called for in the complainants' entry.

*Fifth.* That the complainants did not consent to alter the beginning and lines, as called for in their said entry, but were induced to recognize the survey as it now stands, owing to the artifice of Sullivan, and an impression that Whitaker's claim was good, and that it was dividing the land then in dispute.

*Sixth.* That the complainants' survey of their said entry, was

---

[1] 8 is not actually the walnut, sugar tree and hoop-wood, but two beeches, marked N M by Merewether in Holeman's line—but Z represents the walnut, sugar tree and hoop-wood.

made by Daniel Sullivan, a deputy surveyor, as it is represented in the connected plat by the lines and figures 2 3 9 10 11.

*Seventh.* That the said Sullivan made the said survey in that manner, with an intention to defraud the complainants and to serve the defendants.

*Eighth.* That the said Sullivan, at the time of making the said survey was the agent for the defendant Whitaker, and had full powers from him to take any necessary steps concerning his claim which he might think proper.

*Ninth.* That at the time the said Merewether entered into the bond, stated in the defendants' answer, he thought and believed that Whitaker had an improvement made by himself on the land for which he had obtained his certificate for a pre-emption.

*Tenth.* That the complainant Owens made no confirmation of the agreement between the defendant Whitaker and the said Merewether, except when he was under the impression and belief that the said Whitaker's claim was a legal one, and that the agreement was designed to prevent a dispute between them, by dividing the land between them, which the complainant Owens then supposed would be covered by both their claims.

*Eleventh.* That the complainant Owens' consent to the dividing line, as run between him and Whitaker, by Sullivan, was procured by the fraudulent conduct and misrepresentation of the said Sullivan.

*Twelfth.* That the complainant Jackson never consented to change the beginning or lines, called for in the entry of the complainants, or ever confirmed the agreement made between Merewether and Whitaker, or ever consented to the dividing line, as run between the claims of the complainants and Whitaker by Sullivan.

*Thirteenth.* That Nicholas Merewether was agent for the plaintiffs, for the purpose of surveying and securing for them 1,334 acres of land, under the military warrant in the bill mentioned, and did on the —— day of April, 1780, enter into an instrument of writing with the defendant Whitaker, in the words following, to-wit:

" Know all men by these presents, that I, Nicholas Merewether, of Kentucky county, and Aquilla Whitaker of said county, are held and firmly bound unto each other, in the penal sum of twenty thousand pounds, current money of Virginia, value received of each, to which payment we bind ourselves jointly and severally, our joint and several heirs, executors, administrators and assigns

Now know ye, That whereas the said Nicholas Merewether and Aquilla Whitaker hath agreed to divide a certain tract of land, lying in the said county, by the line hereafter mentioned, on which said Whitaker hath obtained a pre-emption, and Nicholas Merewether a military warrant for Joel Jackson and Brackett Owens, and have agreed to run a south course from Mrs. Pendergrass' corner, a walnut, sugar tree, and hoop-wood, on the south side of Brashear's creek, running thence on Holeman's line south with said line, to determine each other's quantity. Therefore, the condition is such that the above bound Nicholas Merewether and Aquilla Whitaker, shall well and truly stand to and abide by the above agreement, else to remain in full force and virtue."

Sealed and delivered in the presence of

MERET PRICE.

WM. McCOY.

*Fourteenth.* That the said writing was delivered up to the defendant Sullivan, by the complainant Owens, after the survey of the said complainant in the bill mentioned was made, at the request of the said Sullivan.

*Fifteenth.* That the said Owens was apprised of the contents of the said writing and acquiesced in, consented to, and recognized the same, under the impression that Whitaker's claim was good.

*Sixteenth.* That the defendant Whitaker did not include any improvement made by him in the survey, described by the lines and figures 11 45 46 47.

*Seventeenth.* That the defendant Whitaker, by a certificate from the commissioners, had a claim to an improvement in that part of the country, but that the defendant Whitaker had no improvement on the land described in the connected plat by the figures and lines 11 45 46 47. That he, the defendant Whitaker, had two improvements in that part of the country, which he purchased from Margaret Pendergrass and John Porter.

*Eighteenth.* That the defendant Sullivan did make the survey of the plats in the manner it now stands, with an intention to defraud the complainants and to serve the defendants, and did not make the same in conformity to the directions of the said Owens, and to the aforesaid instrument of writing.

*Nineteenth.* That the plaintiffs' survey was returned by the said Sullivan, and that the patent had not issued thereon, before the complainants had been informed of the fraudulent manner in which their claim had been surveyed as above mentioned, so as

to enable them to prevent a patent being issued on the said survey.

*Twentieth.* That the said Merewether was paid a consideration in land warrants by the complainants for making the said entry, at the time of making the same, but had no authority given him by the complainants to sell, exchange, or give up the said entry, but had full power to survey and secure the same in as ample a manner as if they had been present.

NICHOLAS for complainants.—I will consider, *First.* The foundation and relative goodness, independent of all subsequent transactions.

*Secondly.* How the right was altered by the agreement with Merewether.

*Thirdly.* How by Owens' subsequent confirmation of that agreement.

*Fourthly.* By what passed between Owens and Sullivan, at the time of making the survey.

*Fifthly.* How altered by the subsequent transactions of the parties, and

*Sixthly.* The equity arising from the whole.

*First.* Of the foundation and relative goodness of these claims, independent of all subsequent transactions; and first of their foundation.

Margaret Pendergrass having on the 17th day of November, 1779, obtained a certificate for a settlement and pre-emption in Kentucky county (now Jefferson), about eight miles from the head of Brashear's creek, on the south side thereof, to include her improvement and pre-emption of 1,000 acres adjoining, and having, on the 7th of December in the same year, entered her settlement right with the surveyor in the same words, except to include her improvement, in the beginning of the winter 1780, she, Holeman, Porter, Boone, and Pope, employed Merewether to survey their claims so as to prevent any clashing between them; this was accordingly done and all their claims made to corner at an elm on the creek, designated in the plat.by a tree. And these surveys after they were so made, were approved of by the several parties, particularly by Mrs. Pendergrass, whose lower corner on the creek was fixed at a walnut, sugar tree, and hoop-wood, represented by Z on the plat.

Before any change had taken place, the complainants, on the 21st day of April, 1780, made their entry.

On the 22d day of April, in the year 1780, the defendant obtained a certificate for a pre-emption of 1,000 acres of land. The claim of the complainants is the best, both in law and equity; it is legal beyond the possibility of a doubt, and covers the land in question. The entry of the complainants corresponds with the claim now set up by them, as exactly as it was possible to have made it. Merewether, who made Holeman's, Boone's, Pope's, and Porter's surveys, also made this entry, both after those surveys were made, and after they were approved by Mrs. Pendergrass. These surveys although not made by legal authority, were of public notoriety, and had acquired the names by reputation. This would have been sufficient to justify a call for them, as the surveys of the persons for whom they were made, and for the corners and lines of those persons.

But independent of this circumstance, the complainant's entry contains a sufficient degree of certainty. It calls to begin, " on the creek, at a walnut, sugar tree, and hoop-wood, these answer exactly at Z; then on Holeman's line to his lower corner; then on the said Holeman's line east to his corner, a beech and sugar tree." This is justified not only by those lines and corners being made for Holeman by Merewether, but by their being now his patented lines and corners; for his survey, as made by Merewether, never was changed, as appears by the plat: " thence south on a marked line to a corner, a poplar and beech; then on the said line west to the said creek." These lines and this corner were marked by Merewether before the entry, and correspond exactly with the calls of it.

" Thence north to the said Pendergrass' south-west corner." Although this line does not strike Pendergrass' corner, there can be no doubt where it ought to run, because it was to run north from the end of the last line, because this line was marked at the same time with the others, and because it was evident from the last call in the entry, " thence to the beginning," that this line which was to run north was to stop at Pendergrass' line, although it did not strike her corner, so that this entry was as special as it could have been made, by calling for a special beginning, particular courses, lines, and corners. Besides this, Merewether gave the defendant positive notice at the time he obtained his certificate, that the complainants' entry was made on this land.

From these observations, it is evident that the entry of the complainants entitled them to the land now claimed by them, and

that that entry being prior to the defendants' certificate, they neither intended or have done them any injury by the making of it.

Their claim is founded on a military warrant, the entry on which was made before the defendant obtained his certificate, and the law had provided for the making of entries on military warrants at the time, and had declared that they should be valid.

When the entry of the complainants was made, the defendants' claim had no existence, and the right vested in them by it could not afterward be divested unless the law had said it should. This is not the case, for the law has contemplated such disputes; and has only declared that such locations should be void when made on the lands of actual settlers. Chan. Rev. 92.

This expression, "actual settler," is used twice in the same law, and must have the same meaning each time, and it is first used to designate men who had settled themselves on land; improvers it considers as a different kind of people. When this law then only declares locations made on military warrants on the lands of actual settlers void, it leaves them as they were as to all other claims; that is, superior to all others, of which they had the priority. *Expressio unius est alterius exclusio.*

It is superior in law to the defendants, because when the certificate was granted to the defendants, it was not for land, to which no other person had at that time any legal right or claim.

The defendant's claim is inferior in every point of view.

As the certificate was granted for, and to include his improvement, that must be considered as the principal call in the location, and it is absolutely necessary he should show he has actually included his improvement, but the facts contradict even the supposition.

The facts ascertain that he had two improvements purchased of Pendergrass and Porter, neither of which he has included.

But admitting he had included one of them, the claim would not be good, because the certificate calling to include his improvement, it would be uncertain which was the improvement called for, and the including the improvement is essential to the claim.

But considering his claim as if it could be good without including an improvement, his locations with the commissioners is, "to lie on the west side of the creek, and to be below and adjoining the land of Pendergrass." This expressly confines him to one side of the creek, and to adjoin Pendergrass on the lower side. As this certificate was obtained after the survey made for Pendergrass by

Merewether, and after also the making the complainant's entry, which calls for Pendergrass' lower corner on the creek, and as the defendant had express notice of the situation of the complainant's entry, which calls for that corner of Pendergrass, he must have had full notice of the manner in which Pendergrass's claim had been then surveyed, and must therefore have intended to have adjoined it as then surveyed.

Suppose the defendant had surveyed before Pendergrass' survey had been changed, and had adjoined her as surveyed by Merewether, would he not on proving that his entry had been made after the survey made by Merewether, and before the second, and that at the time his entry was made, Pendergrass declared she would abide by that survey, and that that survey was then generally known by the name of Pendergrass' survey, although it was a private survey, have been considered as justifiable in making his survey in that manner; and if he would, would it not have been because it was the intention of his entry, that he should make it in that manner? And if that was the intention, will it not now compel him to make it in that manner?

If the defendant ought to have adjoined Pendergrass as then surveyed and ought to have adjoined her the whole length of her lower side line, as was certainly the case by his location with the commissioners, his claim ought to have been surveyed between the line 8 14 and the creek, and a line run from 14 to the creek, so as to give him his quantity. Whereas by surveying as he has done, so as to make the line 11 47 his northern boundary, he has but 681 acres between that line and the creek, and therefore has thrown out of his survey 319 acres, being the quantity between 8 14, and 2 28, which ought to have been included in his survey. This has caused him to run over the creek for so much, contrary to his express location with the commissioners, which confined him to one side of the creek. The defendant's entry with the surveyor is younger than the entry of the complainants, and therefore can not change his location with the commissioners so as to affect them; but in fact the entry does not change the ground. If it could affect the complainants, it would not justify the defendant in crossing the creek, because it does not express that he shall, and is silent as to the length of the line that was to run south from Pendergrass' corner; therefore taking the certificate and the entry together, it would make his location to be, to lie between Pendergrass' lower line, a line run south from Pendergrass'

Owens *v.* Whitaker.

lower corner on the creek and the creek, and to run west for quantity.

It was evidently the defendant's intention, when he made his entry with the surveyor in September, 1780, to have run his claim in that manner, because Pendergrass before October, 1783, had no idea of changing her ground; therefore when he calls to adjoin her he must have meant to adjoin the line 8 14, which was then universally considered as her lower line, and not the line 2 28, which he has now joined, and which was never thought of as her lower line, until three years after his entry with the surveyor had been made.

He obtained his certificate without any legal foundation. And after having been informed of the exact situation of the complainants' claim, located his pre-emption so as to cover a part of the land included in their entry; he has therefore knowingly, willfully, illegally, and fraudulently caused this interference with the complainants.

The complainants' claim being superior to the defendants, both in law and equity, the next inquiry is, how has it been affected by the agreement between Nicholas Merewether and the defendant?

That Merewether had no authority to make such agreement, is proved by the thirteenth and twentieth facts. But even if he had possessed such power, the agreement would not have been binding, because it was made under a deception as to the goodness and legality of the defendant's claim (see fact the ninth), and because so far from answering the purpose for which it was intended, that is dividing the land in dispute—it not only gave that up, but other land to which the defendant had no claim.

But this agreement really did not give up the land on the south or east side of the creek, because it does not express how far the line from Pendergrass' corner shall run south; and it must be intended to have meant that it should stop at the creek, as from the defendant's certificate he had no right to cross it, and of course there could be no dispute as to the land which lay over the creek. And even with this construction, every foot of land is given up by the agreement which was claimed by the defendant, instead of making a division of it between him and the complainants, as it was the intention of the agreement to do. Being made then under false ideas of law and fact, it is void, even if he had authority to make it. An agreement obtained by fraud is void. Prin. of Eq. large ed. 74, 130. Ignorance of a right sufficient to set aside an agreement

also, the cause being doubtful, a ground for relief.   1 P. Wms. 230, 40; 3 P. Wms. 32; Brown, 219; 1 Vern. 32; Ca. in Eq. 357, 10.

The third inquiry is, how is the right of the complainants altered by Owens' subsequent confirmation of the agreement?

It appears that when this happened, Owens thought the disputed land was to be divided between them, and that the complainants were to derive some benefit from the agreement.   And it does not appear that he had then had any information of the fraudulent and illegal manner in which the defendant had obtained his claim; and certainly no confirmation made under such important deceptions, could bind him.

The fourth inquiry is, how is the right of the complainants changed, by what passed between the complainant Owens and Sullivan, at the time of making the survey?

It appears that Sullivan was fully empowered by the defendant to act for him as his agent in this business, and therefore the defendant is answerable for his conduct on the occasion; and that Sullivan practised a gross fraud on the complainant Owens, appears by the facts.

And it is contrary to every principle of reason, justice, and equity, that the complainants should be bound by any thing done by Owens, which was produced by the fraud and deception of Sullivan.

I will now inquire how the right of the complainant is affected by the subsequent transactions of the parties.

To understand these a particular attention to dates will be necessary.

The complainant's and defendant's surveys were made by Sullivan in October, 1783; the complainant Owens left the country immediately, and did not return to it until the winter of 1784 or 1785; in his absence Sullivan recorded his plat, and the complainant's patent is dated in June, 1785.

The complainant Owens, when he returned to the country, was an entire stranger to the lines, and the first information he received on the subject was in the spring or summer of 1785, from Sullivan, and in December, 1785, he went to Richmond to enter caveats against the defendant and Wilson.

The facts and dates will explain every thing that has fallen from the complainant Owens, as to his being satisfied with the survey; every thing which fell from him was either before he was acquainted with the real situation of the survey, and of the fraud

which had been practised on him, or before he knew that he could be relieved against that fraud, therefore can not operate to his prejudice.

I shall lastly consider the equity arising from the whole. The complainants having a right under their entry to every foot of land now claimed by them, the defendant having no legal claim to any part of it, and no pretense of claim to one foot of land on the south or east side of the creek, entered into a written agreement with Merewether, who had no authority to make such a contract for the complainants, with a declared intention of dividing the land in dispute; by which, instead of dividing the land in dispute, all that was claimed by the defendant was given up to him, and as he now contends, a great part of the complainants' claim beside, to which he had no claim.

The complainant Owens, when he came out, on being informed that this agreement was to divide the land in dispute and to put an end to the dispute, declared himself contented with it.

The complainant's entry called to begin at a corner fixed for Pendergrass' claim by a private survey, which corner was afterward moved without his consent; those who moved it assuring him at the time it was done, that it would not affect his claim, when it effectually destroyed one-half of it. The complainant Owens applied to Sullivan, a deputy surveyor, to survey his claim, and directed him to do it agreeably to entry. This, Sullivan, who was the defendant's agent, refused to do, because it would interfere with the defendant.

At a second meeting he made the survey contrary to location, for the express purpose of favoring the defendant, and after practising the grossest fraud on Owens, in showing him the land, got him, as he says, to make a choice.

Sullivan informed the defendant of the cheat he had practised on Owens, and returned the complainant's survey as made, though evidently and to his knowledge contrary to location; but changes the defendant's in the most exceptionable part, but still leaving him his full quantity of land, and patents have issued agreeably to such surveys, by which the defendant who had no legal right to any land, and not a claim of any kind to the land on the east or south side of the creek, has got 1,000 acres, including 600 or 700 acres of the complainants'; and the complainants, instead 1,334 acres contained in their special entry, have only 760 acres; and

the residue of their entry is surveyed on land so manifestly out of their entry, that it is impossible they can hold it.

The plain equity arising in this case is, that the defendant who claims the land under an agreement made with Merewether, who was not authorized to make it, and who made it under such ignorance of the law and fact arising in the case, as would alone be sufficient to destroy the agreement; who claims it under a survey made in a fraudulent manner by his agreement, and for his benefit, which fraud on being informed of, he sanctioned by his subsequent act, and now claims the benefit of, shall be obliged to convey to the complainants all the land to which they have so just a title, and to which he has obtained the legal right by the illegal and fraudulent means above stated.

MURRAY for the defendant.—The party who asks relief from a court of chancery, must do equity, and must come into a court with clean hands.

This is not the situation of the complainants. They have a legal title to 1,334 acres of land, from no part of which have they been evicted, and yet they demand more land of the defendant. I contend that Nicholas Merewether was fully authorized to make the agreement he did between the complainants and the defendant, and that having made it, his act is binding on them.

By the 20th fact it appears that Merewether had full power to survey and secure; therefore, if from such circumstances he found he could secure the land by making the survey in any other way, he was not bound to survey it according to entry, and this would be neither giving up, selling or exchanging the land.

The complainants ought not to recover in this suit for this reason. The complainant Owens had notice of the true situation of the business time enough to prevent the issuing of his own patent, and therefore had notice time enough to prevent the issuing of a patent to the defendant.

That they did not caveat was their laches, and operates to the injury of the defendant; for even if they had prevailed, the defendant might have obtained another warrant, which now he can not; not having done so then, the complainants and not the defendant, shall suffer for this neglect. Ambl. 440; Eq. Ca. Abr. 404, 356-7; 1 P. Wms. 394; 2 Atk. 49.

It does not appear that the complainants will lose any part of the land contained within their patent, Mathews, etc., must recover on their own strength, and not on the weakness of the complain-

ants, for the defendant has the legal title.   2 Ves. 90; Gilb. 52, 148–9 ;  4 Burr, 2,487–8.

By the decree prayed for, they would be certain of gain and can not lose; besides the complainant Owens, by his bill, disclaims all title to the land out of their entry.

If Sullivan the surveyor, made the survey of the complainants fraudulently, they had their remedy at law against him, which will bar them of their remedy here against the defendant.   Brown, 27. The agreement is good because it was made to prevent litigation, therefore the court will not examine nicely into the right.

If two men have a claim to the same land, one will always have the best right; therefore, it shall not be objected, when it is discovered who has the best right.

If the complainant's claim had proved the worst, the agreement would have been good, and it is certainly contrary to every principle of equity, to let him set aside the bargain, merely because it is a losing one.

There is no fact by which the conduct of the defendant is impeached.

If the dispute was about the legality of the defendant's claim, it would be necessary for the court to declare it to be void, because he had not made an improvement on the land, before they determined against him.

I believe it has been a doubt both with the court and bar, how far an inquiry ought to be made into the foundation of claims of this description.

By a decree such as is asked, you would give the complainants more land than they are entitled to, and by this means you would enrich them, by the loss of the defendant, which shall not be. Prin. of Eq. 143, 153–4.

BRECKENRIDGE for the defendant.—I rely on the 15th fact as the anchor of the cause.   The complainant Owens' acquiescence stated by that fact, makes Merewether's original agreement, the agreement of the complainants.

Beside, you can not determine upon the validity of the defendant's title in this indirect manner; for before you can invalidate any title, you must make a direct inquiry into it; here the ground of the suit is a fraud alleged to have been committed.

The defendant has the legal title, and against that nothing can be presumed, until after eviction.   1 Ves. 445, and *Wilkinson* v. *Marshall;* 1 Atk. 10, 591.

It is no ground to set aside an agreement that it is prejudicial to one side. 1 Ves. 120. '

The defendant's is a perfect legal right, and the fact objected to is one that can not be inquired into.

If we are bound now to prove an improvement, it might with equal propriety be required of us fifty years hence, when it would be impossible to do it. Merewether's bond must bind the complainants, because it was binding on the defendant; and that he had no improvement, could be no objection to the agreement on his part, because that was not the consideration to him, but the complainant's title which was a good one. The decree prayed for, would do iniquity to the defendant, and over justice to the complainants, because they would get more than their quantity; for it does not and can not appear in this suit, that they will lose the land patented to them, and they ask a conveyance for land not in their patent.

As to the fraud of Sullivan, certainly the defendant is not bound by it. It is a maxim that if an agent exceeds the authority given him by his principal, the principal is not bound by his act.

In a contest between the complainants and the defendant on their claims, the defendant's would be considered as the best, for he has an improvement so near to Pendergrass' claim, that by adjoining Pendergrass' with a survey of 1,000 acres, he would include it.

But the general idea of the people in 1770, that these claims were the best, is sufficient to support the agreement for a division, and if the defendant had adjoined the line 8 14, he would have taken more land from the complainants, therefore they can not complain of it.

The defendant had a right to all the land between 11 2, and where the creek crosses Holeman's line, and therefore by the agreement, the land in dispute is divided between them.

The authorities that an agreement may be set aside for fraud, do not apply here, because no fraud in the defendant is proved.

Nor is there in this case either the *suggestio falsi* or *suppressio veri*, for the facts do not ascertain, even if the defendant's claim is a bad one, that he was privy to the badness of it.

I take it for granted, that the complainants can not prevail on the ground of fraud, unless it is established that the defendant knew of the badness of his claim. If he thought it good it is sufficient, although it was otherwise in the eye of the law, because it

Owens *v.* Whitaker.

is to settle a dispute the agreement was made, and such agreements are favored in equity.

But if the defendant's claim is good for nothing, it is not material here; for this suit is not brought to try the original title, but is founded on fraud, and no fraud appearing on the record, it can not be presumed.

NICHOLAS in reply.—No presumption can be indulged against the complainants, because they have a legal title to 1,334 acres of land—for so much of that quantity, as is not within their entry, will be taken from them, either by an elder patent for the same land, or a special claim with a younger patent; indeed, there is no doubt but that they will lose it.

Neither is it necessary that the complainants should have waited until they were evicted; they have a right to stand on the footing their entry properly surveyed would have placed them, and this is all they demand, and their complaint is, that such would have been their situation, but for the fraud of the defendant.

It is objected, that by a decree in favor of the complainants, they will have more than their quantity, inasmuch as they would, beside the land patented, get that which they allege ought to have been surveyed.

This objection can have no weight; for the complainants ask only their quantity. Let them have a decree for the land which is contained within the bounds of their special entry, and they will cheerfully convey to the defendant that part of their patented land which is not within their entry.

And this can be directed by the decree, although not offered in the bill. 1 P. Wms. 726. It is true the complainants might have maintained their action against Sullivan for damages, but they are entitled also to recover the land they ought to hold by their entry, and they had a right to elect their remedy. 1 Ves. 445.

Suppose Sullivan not to be able to recompense them in damages, are they to suffer the loss?

But the foundation of this suit, is the fraud of the defendant or of his agent, by which he is bound, reaping the benefit of it, and knowing and having approved of it.

That agreements to prevent litigation are favored, I do not dispute. But in such cases the claim of each must be obtained fairly and without fraud. As where a question arises as to the legal operation of a will or deed, an agreement made with the party claiming under a will or deed will be binding, provided it was not

obtained by fraud, or is not forged; but made with a person claiming under a forged will, or a deed made by a person pretending to, but not being the party having right, would certainly be void.

It is said this agreement must be binding on the complainants, because if their claim had turned out to be the worst, it would have been binding on the defendant; but this will not hold. The complainants' claim had a legal foundation. But suppose their entry had been made without a warrant to authorize it, it would have been void.

Whether it is contrary to all principles of equity, to let the complainant set aside this agreement, because it is a losing one, depends upon the inquiry whether the loss is occasioned by events subsequent to the agreement, or by those which existed at the time, but were unknown to the complainants. One of the counsel for the defendant relies particularly on the 15th fact, and that Owens' acquiescence makes the agreement good.

But it is certain the same true information is necessary to make a confirmation binding, as is required in making the agreement itself.

And he contends also, that the court can not determine against the defendant's title, in this indirect manner, without inquiring into it. But that is not the case where the suit is brought for a fraud. The ground of this suit is the fraud; but when the question of title is brought in collaterally, the court may determine on it. 1 Ves. 447.

The argument is not a good one, that they can not be expected to show their improvement, because they will not be able to do it fifty years hence. There is no new law for these cases. If the fact is essential, the testimony respecting it ought to be perpetuated. I did not contend that if an agent exceeds the authority given him by his principal, that the principal is bound by it; but if the principal accepts, and takes what is gained by the fraud, he gives a sanction to it.

At the May term in the year 1794, the following opinion was pronounced:

By the Court.—In deciding on this case, three questions seem to present themselves.

*First.* What are the merits of the contending claims?

*Second.* What ought to be the effect of the ignorance on the part of the complainants and the fraud on the part of the defendant,

which are found by the jury, and to what remedy, if any, are the complainants entitled.

First the merits of the claims.

The complainants' entry with the surveyor, and the defendant's location with the commissioners, appear to be sufficiently special, so that in this respect, the two claims are on an equal footing; and if a pre-emption right is of superior dignity to an entry made under the present government on a warrant for military service, yet the defendant Whitaker, not having identified his improvement, or shown that he has included it in his survey, his claim can only have the dignity of a survey made on a treasury warrant.

The defendant Whitaker's survey is subsequent to the entry of the complainants, and therefore if the complainants had surveyed agreeably to their entry, theirs would have been the superior claim. But the land in contest is not included in their survey. Their whole quantity has been surveyed elsewhere, and a grant has issued thereon.

That their survey has been made in this manner the complainants allege the fraudulent advantages taken of their ignorance by the defendant; this leads to the second question.

What ought to be the effects of the ignorance on the part of the complainants, and the fraud on the part of the defendant, which are found by the jury? Some doubt seems to remain whether Merewether, as agent for the complainants, was authorized to enter into an agreement to give up any part of the land included in the complainant's entry; or whether the line agreed on does divide any of the land included in the complainant's entry, and the defendant Whitaker's location, which was the object of the agreement. But as Merewether, when he entered into the agreement, believed that Whitaker had an improvement made on the land by himself, and as Whitaker does not show the improvement on which he obtained his certificate for a pre-emption, but on the reverse it is found that he has not included such an improvement in his survey, Merewether must have been deceived by his certificate as to the goodness of the right, and by this deception was induced to enter into the agreement.

This being the case, the complainant ought not by any principle of law or equity to be bound by any agreement entered into under a mistake so material, and which was produced by the conduct of the other party to the agreement, and by the certificate which he had obtained.

If the complainant Owens had given his approbation to this agreement, after he was informed of the true state of the case, the court might be in some doubt how far it ought to be binding; but as it only appears that Owens recognized this agreement while he was under the same mistaken impression with Merewether when he made it, there can be no doubt but the confirmation is also nugatory. Owens' recognition of the survey made for the complainants, which was induced by the artifice and misrepresentation of the defendant Sullivan, as well as the impression that Whitaker's claim was good, must on the same principles be void; more especially as Sullivan did not make this survey in conformity to the direction of Owens, but with an intention to defraud the complainants, and to serve the defendant Whitaker, when he was Whitaker's agent.

It may be unjust to charge Sullivan's artifice, misrepresentation, and fraudulent conduct in this business to Whitaker; but it must be much more unjust that Whitaker should be profited thereby, and that too at the loss of the complainants.

On the whole the court are of opinion, that the claim of the complainants ought not in any part to have been changed from the place of their entry on account of the agreement made between Merewether and Whitaker, or any consent given to this agreement, or to the survey made by Sullivan for the complainants by Owens. And the court is also of opinion that the complainants have shown a better claim to the land included in their entry than the defendant Whitaker has shown.

The remaining question then is: to what remedy are the complainants entitled? This to the court is new, and seems to be attended with difficulty. The complainants having obtained a grant for their full quantity of land on the survey made by Sullivan, if it was shown they were decidedly faulty in the business, they should certainly be bound thereby as *particeps criminis.* But this not appearing to be the case, the court, it is conceived, ought to put the complainants in the same situation which they would have been in had their survey been made in conformity to their entry.

Whereupon it is decreed and ordered that the defendant do, on or before the 25th day of December next, convey unto the complainants by deed in fee simple, all the land contained in the entry made in the name of the complainants and Jonathan Smith for 1,334 acres, and which is contained in the grant of the defendant, obtained on his right of pre-emption. It is further decreed

and ordered that the complainants convey to the said defendant, on or before the said 25th day of December next, by deed in fee simple, with special warranty, an equal quantity of the land to that above decreed to be conveyed by the defendant to the complainants, contained in the said complainant's grant, obtained on the said entry, and not included in the land specified by the said entry, to be laid off from the east or west end thereof, as the said defendant shall choose. Order of survey, etc.

And at the October term, in the same year, the surveyor having made his report, the final decree was pronounced. But it being certified by the counsel for the defendant to the court that there was error in the decree, in the following instances, to-wit:

*First.* That it is alleged as a ground for the said decree, that the contract entered into between the agent of the complainants and the defendant, and afterward confirmed by the complainant Owens, was made and confirmed under a belief that the claim of the defendant was a better claim than that of the complainants. Whereas if the defendant were to be bound by it, when contrary to his interest, the complainants ought also to be bound if in the event it should prove otherwise. And it being an agreement to prevent litigation, it ought to be carried into full effect without a strict examination into the consideration of that agreement, or the original right of the parties.

*Second.* That the complainants were not entitled to relief, having fraudulently continued their entry as first made and not changed the same agreeably to the agreement.

*Third.* That the supposed fraud of Daniel Sullivan can not affect an agreement long before entered into and confirmed as above.

*Fourth.* That by the said decree the court have not only pronounced that the said agreement was void, but also have made an exchange of lands between the parties which they never consented to, or contemplated, and which was not the return of property formerly exchanged, bargained, sold, or agreed for. And have decreed land to the defendant, which the complainants in their bill declare they have no right to, and which they also declare they can by no means hold under their patent.

The court directed the cause to be reheard on the fourth day of the next term. And at the May term, in the year 1794, the argument came on.

MURRAY for the defendants.—The decree in this case is founded on an inquiry into the comparative goodness of the titles of the complainants and defendant, and is therefore erroneous.

It is going into that inquiry which was intended to be prevented by the agreement; the object of that agreement having been to settle between themselves all disputes which might arise as to the comparative goodness of the titles.

Where there are two claims to one tract of land, one must be better than the other; but that is no objection to an agreement made to settle the dispute, and the case is exactly like those to be found in the books. 1 P. Wms. 239, 240.

In all the cases the contest settled by the agreement must have been between two equitable or legal titles, and if the doctrine here established was to prevail, no such agreement could be sustained.

The complainants are not entitled to relief, for they pretend to acquiesce in the agreement, and while the defendant Whitaker was on his part carrying it into effect, they fraudulently continued their entry as first made, when by the agreement they ought to have changed it.

The decree directed the complainants to give up to the defendant Whitaker, land to which they acknowledge they have no right; this is surely a mockery. And although a court of chancery has a right to shape its decrees according to the circumstances of the case, yet the subject of the decree must be something growing out of the suit between the parties, which is not the case here. But by this decree an exchange is made between the parties without their own consent, and the defendant Whitaker is compelled to give up land, without having it in his power to get it elsewhere, which he might have done had the dispute not have been settled by the agreement.

BRECKENRIDGE on the same side.—My principal objection to this decree is this: that by the principle on which it is grounded no doubtful right can be compounded. The agent sees a claim which clashes with that of his principal; he makes an agreement to settle the dispute, but afterward finding the claim with which he has compromised to be inferior, he breaks off without any kind of foundation either in law or fact. And this the court by the decree have permitted, because the defendant's claim is the worst. This I conceive to be contrary to settled principles. Not only is a doubtful right sufficient to ground an agreement of this kind, but the supposition of one. 1 Atk. 10; 1 Ves. 19, 450; P. Wms. 727; 2 Ves. 120; 2 Atk. 591.

The defendant Whitaker in obtaining this right held out no false

Owens *v.* Whitaker.

colors, as that he had an improvement when he had none, and whether the improvement was made by, or for him, is now immaterial.

The claim of the defendant Whittaker was not bottomed on a false foundation, and no supposition or presumption ought to have been admitted that his claim was not good, for there had been no eviction.

The inquiry could not be made whether Whitaker had an improvement on the land or not, for it was not put in issue; beside, from the nature of such agreements, one of the titles must always be the best, and it is of no consequence which it is. The complainants are guilty of a manifest contradiction in saying, while they ask a decree that Whitaker shall convey his title to them, that he has no title at all.

The going into this inquiry has operated as a surprise on him, for Whitaker was not apprised that it was necessary to prove his improvement. This agreement bound Whitaker, and therefore ought to be binding on Owens, and if Merewether did exceed the power given to him, his conduct has been since recognized by Owens. What right have the court to decree this exchange of lands? Courts will not meddle with men's contracts. 3 Black. 435. But why not decree any other part of Owens' land to be conveyed to Whitaker as well as this?

The court might as well decree that land should be given for horses, as that this part of the land should be given for another part. Is it to reward Whitaker for having committed a fraud that you decree him part of Owens' property, and that property too, to which Owens confesses he has no title?

NICHOLAS for the complainants.—This cause being reheard on the thirty-fourth rule of court, the rehearing can only extend to such matters as are pointed out as erroneous in the certificate.

I will begin with the first objection to the decree which contains three parts; the first part of this objection mistakes the ground of the decree. It is not that the defendant's claim was not a better claim to the land than the complainant's, but that he had no legal claim at all, not having any improvement on the land, therefore he gave no consideration to the complainants for what they gave up to him.

And Merewether was deceived by the fraud of the defendant, in representing his as a legal claim to this spot, and of consequence that the agreement being made under a deception as to the good-

ness of the defendant's claim, was sufficient to set aside the agreement.

There is a great difference between an agreement to settle a dispute between two real claims, and between one real claim and a fictitious one to the same land. The first is like a dispute between the heir-at-law and a devisee, under a will properly executed and proved. The second is like one between the heir-at-law and a devisee under a will not properly executed, or disputes between the owners of two special entries which really interfere, and between the owners of two entries upon a false representation by the owner of one that there was an interference when there really was none, in consequence of which the owner of the other entry agreed to divide the land. 1 Ves. 120.

An examination of the complainants' entry, the defendant's certificate, the agreement with Merewether, and the facts found by the jury, will make the fraud on the part of the defendant, and the deception on Merewether and the complainant Owens manifest.

The complainant's entry is special for every foot of this land. His right, therefore, at the time of the agreement was unquestionable unless there was another legal claim to part of the land.

· The defendant's certificate was granted after the making of the entry of the complainants, when the defendant had full knowledge of their entry. The complainants by their entry neither intended or did the defendant any injury or injustice; but the defendant by locating what he knew to be the complainants' land, under pretense of having an improvement there when he really had none, and afterward making the agreement with Merewether under the same false pretext, did the complainants great injustice. The defendant's certificate is for 1,000 acres of land for marking and improving the same in the year 1776 to include his improvement. This gave him no right to any land but that improved by him, and on which his improvement was.

The 9th, 10th, 16th, and 17th facts prove beyond all doubt, the fraud put upon Merewether and the complainants by the defendant, and that the agreement was entered into and recognized by them, when under the operation of a deception caused by that fraud. The defendant having two improvements in that part of the country, and locating so as to interfere with the complainants, and include neither of his improvements, shows an intention to injure and defraud them, probably from a fear of what he thought better claims, where his improvements really were.

Owens *v.* Whitaker.

This fraud and misrepresentation as to the improvements was the only inducement to the agreement: for if the defendant had no improvement, there really was no interference. This case does not involve in it the question whether an improvement made for another will give a right; because the jury have found that the defendant had no improvement on this land, made either by himself or another. But let that question be determined how it will, it is always necessary to prove the improvement was on the land.

That an agreement obtained under such a false and fraudulent representation of the goodness of his own right to this land, is void. See 1 Atk. 351; 2 Burr, 118, 396, 619, 933, 1,480; Pow. on Con. 140, 147, 150; 2 Pow. on Con. 150, 152, 156, 170, 196.

As to the second part of the first objection, the true principle of equity is, that agreements ought to be considered as they were at the time of making them, and that subsequent events throwing the loss or gain on one side or the other, shall not affect or govern the decision respecting them; not that where one party is bound by it, the other shall be so too, for this is the case in all fraudulent agreements; the party to the fraud would be bound by that agreement, if contrary to expectation it should prove prejudicial to him. In this case it did not depend on the event, for the defendant had no right at the time, therefore nothing could turn up which would make it contrary to his interest, or to the interest of the complainants. The benefit being all on one side, obtained without consideration, under a fraudulent misrepresentation, the agreement must be void. 1 Atk. 404; Brown, 219; 2 Brown, 152.

As to the third and last part. A court of equity has gone no further than this, that where there were two claims contending, both of which had a fair and legal foundation, if the parties, after being fully apprised of the real foundation of each other's claims, should agree to a compromise upon the right finally proving to be in one only (as must be the case), to determine that the court would not too nicely examine into the consideration of the agreement for a compromise.

But it has always been held that if either of the rights had been originally obtained by fraud, or if either of the parties at the time of entering into the agreement for the compromise, was ignorant of the real foundation of either of the contending claims, that that was a sufficient cause for setting aside the agreement. See 1 Ves. 449, 450, 451, 452; 1 P. Wms. 239, 240; 2 P. Wms. *Cann* v. *Cunn*, 727; 3 P. Wms. 320; 1 Vern. 32.

The second objection is founded on a mistake.

There was no such agreement.   See the bond.

It was not to withdraw the entry, but only as to the mode of surveying, and to divide the land which Merewether then thought was covered by both claims.

The complainant Owens, who still labored under the deception as to the defendant's right at the time of the survey, was then willing to have executed the agreement, and the discovery of the fraud when made would have justified him in not doing so.

As to the third objection, we do not say that any supposed fraud of Sullivan should affect an agreement long before entered into and confirmed.

But the defendant relies in his answer, as well on the agreement with Merewether, as on the complainant Owens' consent to the survey as made by Sullivan, and the giving up the bond, etc.

To counteract this, we prove that this consent was obtained by the fraud of Sullivan, and as Sullivan was the defendant's agent, and committed the fraud for his benefit, the defendant was as much civilly bound by it as if he had committed the fraud himself. See 1 Durnf. 15;   4 Durnf. 46;   1 Ves. 68;   Bull N. P. 31;   2 Durnf. 70.

To understand the real force of the fourth objection, the state of the case, and the reasons which induced the court to make that part of their decree, must be attended to.

This suit was brought by the complainants to recover so much land from the defendant as the defendant had illegally included in his survey, and which they were entitled to under their special entry.

The complainants state, in their bill, their claim under their entry, and the fraud of Sullivan, the defendant's agent, in surveying and returning for the defendant land which did not belong to his entry, and which was included in the complainants' entry. The jury found that this land did belong to the complainants' entry, and that Sullivan, the agent of the defendant, had by fraud left it out of the complainants' survey and included it in that of the defendant.   And they also found that the defendant had no improvement of any kind on this land.

At the hearing it was objected, by the defendant's counsel, that the court ought not to decree the land the defendant had included in his survey, which belonged to the complainants' entry, because if that was done the complainants would stand in a better situa-

tion than their entry gave them a right to, as they would then have not only all the land which their entry called for, but also all the land which was included in their patent and not in their entry. They also added that, as the complainants had not been evicted from any part of the land contained in their patent, they might, for any thing that appeared to the contrary, hold the whole of it. To this it was answered, that if, as there was no doubt was the .case, the whole land was covered by other claims, it would be impossible that the complainants could hold, under their special entry, the land which was not contained in it. That the complainants disclaimed any right to this land, and if the defendant thought they had any claim to it under their patent, that they were willing that the relief they asked should be granted them, upon the condition of their conveying to the defendant all their right to this land under their patent. And the court have decreed that the complainants, before they shall have a right to demand a deed, shall convey their right to this land to the defendant. This, then, is not an exchange of lands, as the objection states it, between the parties, but a reasonable condition imposed upon the complainants, and that by their own consent, which they were to comply with before equity could relieve them.

This does complete justice according to the nature of the case between the parties, and, therefore, must be right, for it is the great advantage of a court of chancery that it is not bound down to any particular judgment, but will always adapt her decrees to the circumstances. " I will not say how far I will go, because the wit of man may devise a fraud beyond those limits, but I will always go far enough." See Powell on Contracts, Intro. ix; 3 Black. Com. 439; 2 Ch. Ca. 5, 233, 234, 251; 1 Ves. 185.

· If it should ever be determined that the getting a patent should be a bar to all relief, fraud would be triumphant in most cases in this country, and then the rules of equity will be so construed as to support fraud contrary to its fundamental principles. See Powell on Contracts, 296; Pre. in Ch. 519; 2 Eq. Ca. Abr. 48, 16; Gilb. Rep. in Eq. 4, 11.

Not only courts of equity, but courts of law in many cases, when applied to, to render their equitable jurisdiction, have a right to grant relief upon such reasonable terms as they judge proper to impose. 1 P. Wms. 726; 2 Durnf. 4; Burr, 254, 1997; 2 Pow. on Contracts, 60, 143, 149, 151, 159, 160, 188; Fra. Ves. 81, 82, 206–10, 214, 226, 293; 3 Atk. 387.

But if the complainants are entitled to relief in consequence of the fraud practiced on Owens, as they clearly are, admitting this part of the decree to be erroneous, who can complain of it?

, If it is not a benefit to the defendant, he need not receive the deed; therefore he can not be injured by it. But strike out this part of the decree, and the defendant will be in a worse situation, and if it is a benefit to him, he can not complain of the error, if it is so, being to his advantage. 2 Bac. Abr. 220; 2 P. Wms. 372; Ld. Raym. 594, 970; 4 Durnf. 510.

The complainants can not complain of it, because it is done by their consent, and consent takes away error. But as chancery has a right to grant relief on what terms she thinks right; as the circumstances of the case ought always to vary the relief; as this was the only way to do complete justice to all the parties, the decree must be considered as right and proper, independent of the benefit of that part of it to the defendant, or of the consent of the complainants.

And now, at this term, the following decree was pronounced:

BY THE COURT.—It does not appear that either the first or the second error assigned is contained in the opinion of the court, but it seems evident, from the opinion, that the decree is founded on the deceptions under which the complainants and their agent, Merewether, acted in the case, and which were occasioned by the certificate which the defendant obtained from the commissioners, and the conduct of the defendant and his agent, Sullivan, and therefore that, instead of the complainants being bound by such acts, equity required that the defendant, Whitaker, should be compelled to relinquish to them all the advantages which he had acquired thereby. In this point of view the court is still of opinion that the decree is well founded.

On the second error assigned, the court is of opinion that the agreement entered into by Merewether, under the deceptions stated in the said opinion, and in the facts on which it is founded, did not bind the complainants to change their entry, and even if the agreement had been *bona fide*, that it would only have bound the complainants to survey agreeably to the dividing line therein specified.

As to the fourth and last error assigned, the court is of opinion that, from the nature of the case, it can not be supposed that the decree has made any exchange of land between the parties. It appears to have been the principal object of the court to restore

to the complainants the land of which they had been defrauded, and this, the court are still of opinion, ought to be done, even if by a prior decree the complainants had lost the whole of the land included in their survey, which was not included in their entry. But this not having happened, and it not being certain that it would ever happen, it was improper that they should continue to hold the land, and also to recover the land to which they were more justly entitled. Therefore, on their offer and consent, in court made and given, to relinquish such lands before the decree was made in their favor, the court were of opinion, and still continue to be of opinion, that it was just and equitable that the defendant should have the right of the complainants to so much thereof as by the decree was taken from the quantity he had surveyed and paid the state for, and that the decree in favor of the complainants should have been made on this condition.

On the whole, the court is of opinion that the interlocutory and final decrees in this cause made and pronounced ought to stand unaltered and confirmed, save only that it is now further decreed and ordered, that the complainants shall, on or before the 1st day of October next, execute a deed to the defendant, Whitaker, as in the said final decree is directed, and likewise that the said defendant shall, on or before the said 1st day of October next, execute a deed to the complainants, as in the said last mentioned decree is also directed. Costs, etc.